UNITED STATES DISTRICT COURT
                         DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA


              v.                                    3:08 CR 97 (MRK)


JUAN MERLANO


                     **DEFENDANT'S SENTENCING MEMORANDUM**


This memorandum is submitted on behalf of Juan Merlano who is to be sentenced by your Honor on July 13, 2010, upon his conviction for conspiracy to engage in financial transactions knowing the money involved was from illicit activity, and with intent to conceal the identity of the owner and/or the source of the funds in violation of 18 USC 1956.

It is alleged, and Mr. Merlano admitted, that he bought dollars physically located in the United States for pesos he had in Colombia. Mr. Merlano then sold the dollars to legitimate businessmen in Colombia who used the dollars to pay their bills abroad or purchase merchandise for import into Colombia. This is done in an effort to avoid paying Colombian taxes and evade the high Colombian bank fees imposed on transmittal of funds abroad.

Later in the conspiracy, Mr. Merlano bought dollars from black market peso vendors and used Virtual Money, Inc, (VM) a remittance company, to take advantage of the difference in rates between what he paid for the dollars at black market prices and what he received

                                        1

via VM in pesos at the higher official bank rate.  In that process, Mr. Merlano was the end user.  Mr. Merlano acknowledged that his activities involved at least 681,000 "dollars."

**The Guideline Computation**

The initial presentence report resulted in a Guideline-calculated sentence of more than twenty years.  Every enhancement that could conceivably be applied was applied.[1]  The accusations against Mr. Merlano and co-defendant Mr. Duque were inaccurate.  The report described Mr. Duque and Mr. Merlano operating as a well-oiled machine with agents ready to do their bidding.  In reality, their relationship was nothing like that.  Mr. Merlano knew Mr. Duque for a 30 to 60 day period late in the conspiracy.  During this time he bought money from Mr. Duque, whose role in the money laundering business had greatly diminished.

The allegations in the PSR simply tracked the allegations in the indictment, which themselves were unsupported.  In a letter to the Probation Department, Mr. Merlano objected to the bulk of the narrative and responded with a factual explanation of what he had done.  He also objected to all the enhancements, arguing that they rested on "bare conclusion[s] without analysis or explanation." United States v. Cotto-Lopez, No. 08-

---

[1] Mr. Merlano's plea was to the indictment, leaving the Court to determine all of the issues related to sentencing.

5337-cr (2d Cir. June 1, 2010). ["PSR's own finding(s) consisted of a bare conclusion without analysis or explanation."][2]

The defendant submits that his guideline score should be determined on the basis of the $681,000 he allocuted to and not what others might have been involved with. The two point enhancement for having pled guilty to a "1956" charge rather than a "1957" charge should be included in the computation even though a judge in the Southern District of New York has characterized such an enhancement as "an extra gilding of the lily that isn't necessary." *U.S. v. Salazar*, Sentencing, 6/21/07 (Ind. No. 05 CR 00708, Hellerstein, Alvin, J.). The base offense level of the guideline, therefore, should be 8, increased by 14 for "laundering" $681,000 of illicit funds, increased again by 2 for pleading guilty to a 1956 count, and reduced by three acceptance points for an adjusted offense level of 21 with a sentencing range of 37-46 months, a sentencing range which more realistically and proportionally reflects his level of criminal activity.

**The Law**

The guideline computation notwithstanding, the Supreme Court has instructed that "district judges are to use [their] reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita v. U.S.*, 127 S.Ct. 2467 (2007), and the case law in this Circuit further encourage district courts to deal with the more nettlesome guidelines such as the quantity driven non-modulated

---

[2] For the Court's convenient reference, attached as Exhibit A are defendant's letters presenting

guidelines which are present in this case. See *U.S. v. Cavera*, 550 F.3d 180, (2d Cir. 2008.). As the Court of Appeals declared in *Cavera*:

> [W]e note that some Guidelines enhancements and reductions apply without modulation to a wide range of conduct. . . . [M]any Guidelines such as those covering 'offenses involving taxation,' U.S.S.G. § 2T4.1, 'antitrust offenses,' *see id.* § 2R1.1, and larceny, embezzlement, fraud, and similar crimes, *see id.* § 2B1.1, drastically vary as to the recommended sentence based simply on the amount of money involved. Here again a district court may find that even after giving weight to the large or small financial impact, there is a wide variety of culpability amongst defendants and, as a result, impose different sentences based on the factors identified in § 3553(a). *Cf. United States v. Ebbers,* 458 F.3d 110, 129 (2d Cir.2006) (concluding that the sentencing disparity between co-defendants in a securities fraud case was reasonable in light of the 'varying degrees of culpability and cooperation between the various defendants'). Such district court decisions, if adequately explained, should be reviewed especially deferentially.
>
> *Cavera supra*, at 192.

**The 3553(a) Factors**

**(1) The nature and circumstances of the offense**

Defendant Merlano is one of thousands of peso brokers hustling to make pennies on the dollar by taking advantage of the difference (the "spread") between black market and official rates. In the interest of full disclosure, my knowledge of money laundering comes not only from the various money laundering clients I have represented, but also from the testimony of expert witnesses called by the Government in several trials involving money laundering. Owners of U.S. dollars, many of whom are narcotics dealers, sell their dollars, physically located in the United States, at a discounted price to black market peso brokers. The peso brokers purchase the U.S. dollars using pesos. The

---

objections to the initial PSR. I have not been given the final version.

primary black market peso broker will buy the money at a specific price per dollar and in turn might sell his interest to yet another peso broker who might in turn sell it to another and another, each making a small profit until finally there is no more profit to be made. The last broker involved is the person to retrieve the money in the United States and place it in a bank account for transmittal as directed by a "buyer," someone who has purchased the dollars to pay their bills abroad or acquire merchandise for import into Colombia.

To the peso broker, the dollar is simply a commodity subject to the vagaries of the marketplace.  And just like commodity brokers, the black market peso broker checks the Colombian newspaper each day for the official exchange rate to determine the price at which he can buy or sell his dollars.  Sometimes the market is stagnant.  That means that the spread between the black market and official rate is so narrow that it is not even worth buying and selling.  It is why in this indictment, for example, the activity is sporadic, often occurring a few months apart.  Mr. Merlano entered the market when the spread was advantageous and withdrew when the spread was too thin.

It is important to note that the spread is the peso broker's main focus, not the transmittal of funds to drug dealers.  In fact, the peso broker who first purchases the dollars is the only one with a connection to the source of the money.  "Clients" names are deliberately kept from successive brokers, lest they try to co-opt them.

5

Peso brokers are like slices in a salami. The greater the spread between the black market rate and the official rate, the more the slices. So it is not surprising that much of the business of peso brokers goes on among themselves, slice after slice until it makes no economic sense to keep slicing. At that point the last broker involved, the last "slice" of the salami, sells the dollars in question to Colombian commercial businessmen, for which the businessmen pay him in pesos; hence the term "peso broker." In the first half of this conspiracy, Mr. Merlano was the last slice, the furthest away from the source or owner of the monies. These newly received pesos are in turn used to buy more "dollars" when the market is favorable or are used to exchange pesos for foreign currency.[3]

For example, a drug dealer or any person in Colombia with money in the U.S. offers to sell his dollars to a black market peso broker for ninety cents on the dollar. The peso broker stands to make 10 cents on each dollar he buys. However, in order to minimize his risk, the broker decides that he would rather make a two cent profit on each dollar. On $100,000.00 the broker would make $2,000.00, a tidy sum. So he sells his dollars for 92 cents per dollar. Now he does not have to coordinate cash pick-ups and does not have to worry about robberies or seizures by law enforcement. He is not exposed and the money can never be traced to him. The second purchaser appreciates the problem and does the same thing, but because he bought the dollar for 92 cents he needs to resell the dollar for 94 cents to make a 2 cent profit. The third purchaser does the same thing, selling the dollar for 95 cents or 96 cents, and so on until profits are so thin they are just

---

[3] In many ways the peso exchange market is similar to the subprime mortgage market, where packaged subprime mortgages were sold from bank to bank, and then from securities companies to securities companies until they got to the investors. The difference is that in the "black market peso exchange" the investor received value for their pesos.

fractions of a penny. Finally, the money gets to an individual like Mr. Merlano whose connection to the original owner of the "dollars" is so remote as to be virtually nonexistent. Mr. Merlano is not just once removed; he may be nine or ten times removed. He is in fact the individual who is the furthest removed from the source of the money if he is the one called upon to physically retrieve the money. He hopes to make his money re-selling the dollars to his clients or to other peso brokers who have their own stable of clients.

Thus the dollars are widgets to Mr. Merlano and his fellow peso brokers, not "narcotics proceeds." And his scraping and hustling continues because he now has to sell the dollars in a market placed filled with similarly situated people looking to undercut the competition. He got out of the business because it was too time consuming, too risky, and offered a low rate of return. He then proceeded to simply buy dollars from other peso brokers and take advantage of the VM scheme whereby he could purchase the dollars for 99 cents on the black market, but receive full value in pesos from an ATM machine. The ATM was literally a money making machine with no work and no risk.

Although Mr. Merlano was a part of the money laundering chain, he was a very small link. He neither handled enormous amounts of money nor was he in direct contact with the owners of the funds. He was a slice somewhere near the end of the salami. So when the government speaks of the $681,000 that Mr. Merlano had a hand in, the money he earned from this sum would hardly allow him to quit his day job.

7

## (2) The history and characteristics of the defendant

The Juan Merlano story is not much different from the thousands of money changers in Colombia.  Most of them have been reared in good homes, have never had any brushes with the law, and do not socialize or interact with drug dealers or other criminal elements.  Many hold full time legitimate jobs.  They are not gangsters by trade.  They are not violent and would never engage in any activity dealing with narcotics directly.

The letters sent in support of Mr. Merlano were not surprising.  They were from honest hardworking individuals who are very far removed from a criminal life style.  Both the picture provided by the Probation Department and the letters from family and friends give the court a good idea of the type of person Mr. Merlano is.

The defendant comes from a close-knit family that started from humble origins.  His parents both left small towns in the interior of Colombia, came to the big city, educated themselves, and became academics.  They raised three children who are close to each other and close to their parents.  The children are all educated and two of the three have college degrees and post graduate credits.  Isabel, the defendant's older sister, is an account executive with a multinational corporation in Toronto.  Diana, the defendant's other sister, is a dedicated housewife.  And Mr. Merlano, a civil engineer, worked for the government for a time, and then established his own business.  Their mother lives in Toronto at least six months a year in order to be with her family.  She has an irrepressible

energy that is constantly looking for the "teachable moment" in this tragedy, but is suffering.

Mr. Merlano had a long time girlfriend, with whom he had a child. He has reliably supported this child, and there has never been an allegation to the contrary. When he was incarcerated he made sure to continue this support with the aid of his family. The mother of his child wrote a glowing letter concerning his responsibility and his affection for them as a family, and of him as a father. In sum, he has been in most respects all the things one wishes in a person, a good son, a good father, a good uncle and a good friend.

### (3) The seriousness of the offense

This is not to say that the offense is not serious. Brokers play their parts wittingly or unwittingly in narcotics trafficking. If a drug dealer cannot get his proceeds from the product he sells, there would be no point in continuing to ply his trade. However, in the context of sentencing, where venality is a key consideration, it is relevant that the overwhelming majority of peso brokers are desensitized as to where the money comes from and nearly all of them, including Mr. Merlano, have no contact with drug dealers.

### (4) Adequate deterrence to criminal conduct

It would not take much to deter these individuals. Defendants are snatched from the streets of their native city or backwater town in Colombia, and brought to Combita prison

9

where they wait for a year to be brought to the United States. They are then taken thousands of miles from home and placed in a jail cell where, in some cases, no one speaks the defendants' language, where, telephonic communication is difficult if not impossible because the prison facilities in state/city jails do not provide for international calling, where families often cannot see their loved ones because they are denied visas. These are all severe hardships that would deter Mr. Merlano and others from future misconduct. These are not hardened criminals, and only recently have these types of defendants been brought to this country. If word of what happened to Mr. Merlano gets around, this would be more than adequate deterrence.

### (5) Reduction of sentence for harsh conditions of confinement

The Second Circuit has held that the circumstances of presentence confinement may in appropriate cases be a permissible basis for a sentence below the applicable guideline range. *United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001). This is such a case.

Several New York district courts have imposed sentences below the applicable guideline range on this basis, see e.g. *United States v. Baum*, 2007 WL 3274894 (E.D.N.Y. 2007) (below Guidelines sentence in part due to "difficult circumstances" of defendant's incarceration, including threat from targets of defendant's cooperation); and *United States v. Salvador*, 2006 WL 2034637 (S.D.N.Y. 2006) (departure based, in part, on unsanitary conditions and lack of food during detention in foreign jail while awaiting extradition). One Judge held a plenary hearing on the conditions of the prison in which

Mr. Merlano was held, concluding that the "conditions . . . were harsh by any American standard." *United States v. Torres*, 2005 WL 2087818 (S.D.N.Y. 2005).

The 2007 U.S. State Department Report on Human Rights Practices describes Colombia's prisons as "overcrowded, corrupt, under-resourced and insecure, and specifically notes that in 2007, Cómbita violated health standards by virtue of its "lack of potable water and a proliferation of insects and rodents." United States Department of State's *2007 Country Reports on Human Rights Practices*.

### **(6) Reduction of sentence for delays in deportation**

If it were feasible, I would ask the court to direct that the last two months of the defendant's sentence be served in the jail where the defendant will await his deportation. This is because defendants who have served their sentence are routinely held for 2-3 additional months, in some cases even more, to await deportation, which consists of nothing more than appearing before an immigration judge, waiving one's rights and conceding deportation.

Unfortunately, this type of sentence cannot be legally imposed. But the court can "reduce" the sentence to account for the approximately 2-3 months that the defendant will have to serve in jail after completion of his federal sentence but before being deported. ICE has been repeatedly asked why its agents cannot process the defendant-aliens while they are serving their sentence. ICE simply responds that the defendants are

not in their custody.[4] I ask that when the court is deciding upon an appropriate sentence it take into account that Mr. Merlano will serve an additional forty days to six months in custody before he is deported.

Wherefore, for all the reasons set forth, the court is urged to impose a reasonable sentence consistent with the sentencing court's duty to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth at 18 U.S.C. § 3553(a)(2)."

Attached hereto are Exhibits A, B, C, and D. The Exhibits are as follows: Exhibit A is defendant's objection letters to the PSR. Exhibit B is photographs of Mr. Merlano and his family. Exhibit C is letters of support from friends and family. And Exhibit D is certificates and degrees Mr. Merlano earned over the course of his career.

Date: July 2, 2010

Respectfully submitted,

David S. Zapp
David S. Zapp, Esq.
7 East 94th Street
New York, New York 10128
David@Davidzapp.com
(212) 410-3351

---

[4] But ICE agents are routinely sent to federal institutions to serve warrants and Orders to Show Cause "why the defendants should not be deported." Why can the agents not take a few more minutes to explain the alien his rights and to ask them whether they wish to waive them and concede deportation, the same questions asked when they are in ICE custody. If this were done, the deportation process could move forward expeditiously and the defendant could be deported immediately upon the completion of his sentence.

**Certificate of Service**

I hereby certify that a copy of the Sentencing Memorandum has been served upon the following via the ECF System:

>**AUSA H. Gordon Hall**
>U.S. Attorney's Office-NH
>157 Church St., 23rd floor
>New Haven , CT 06510

Dated: July 2, 2010

_____
Sam Javna